# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| MELVYN KLEIN, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>     v.<br><br>TEAM HEALTH HOLDINGS, INC., LEIF M. MURPHY, H. LYNN MASSINGALE, JAMES L. BIERMAN, EDWIN M. CRAWFORD, GLENN A. DAVENPORT, PATRICK E. FRY, MARY R. GREALY, VICKY B. GREGG, NEIL KURTZ, SCOTT OSTFELD, and KENNETH H. PAULUS,<br><br>          Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**JURY TRIAL DEMANDED**

Plaintiff Melvyn Klein ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## <u>NATURE OF THE ACTION</u>

1.     This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Team Health Holdings, Inc. ("Team Health" or the "Company") against Team Health, its president, chief executive officer and director Leif M. Murphy, and the other members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Team Health, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rules 14a-9, 17 C.F.R. 240.14a-9 and 17 C.F.R. § 244.100, in connection with the proposed merger between Team Health and entities formed by Blackstone Capital Partners VII L.P. (collectively, "Blackstone") and certain co-investors in order to acquire Team Health via a merger.

2.     On October 31, 2016, Team Health announced that it had entered into an Agreement and Plan of Merger (the "Merger Agreement"), by and among the Company, Tennessee Parent, Inc. ("Parent") and Tennessee Merger Sub, Inc., a wholly owned subsidiary of Parent ("Merger Sub"), pursuant to which Merger Sub will be merged with and into the Company, with the Company surviving the merger as a wholly owned subsidiary of Parent (the "Proposed Transaction").

3.     Pursuant to the terms of the Merger Agreement, Team Health shareholders will receive $43.50 in cash for each share of Team Health common stock that they own (the "Merger Consideration").   The Merger Consideration is insufficient and undervalues the Company. Indeed, analysts recently set price targets for shares of Team Health common stock at $47.00, and the financial analyses performed by Team Health's financial advisor indicate the Company is worth as much as $74.65 per share.   The Merger Consideration also represents a *27.1% discount* compared to the Company's 52-week high trading price of $59.71.   Furthermore, as outlined below, the Merger Consideration is the result of a flawed sales process.

4.     On November 23, 2016, in order to convince Team Health shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.   The Proxy contains materially incomplete and misleading information concerning: (i) the Company's strategic review process and conflicts of interests that tainted the process; (ii) the Company's financial projections; and (iii) the valuation analyses performed by the Company's financial advisor, Goldman, Sachs & Co. ("Goldman Sachs") in support of its fairness opinion.   It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's

shareholders prior to the forthcoming shareholder vote, so that they can properly exercise their corporate suffrage rights.

5.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Team Health and the Board for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9.   Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Team Health shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

7.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

8.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Team Health maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including

Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## **<u>PARTIES</u>**

9.      Plaintiff is, and at all relevant times has been, a shareholder of Team Health.

10.      Defendant Team Health is incorporated in Delaware and maintains its principal executive offices in Knoxville, Tennessee.   Team Health offers healthcare professionals outsourcing services.  The Company supplies physicians, physician assistants and nurse practitioners to hospitals in the United States.

11.      Individual Defendant Leif M. Murphy ("Murphy") joined Team Health as president and chief executive officer in September 2016, in the midst of the sales process, one month prior to the signing of the Merger Agreement.  He is also a member of the Team Health Board.   Murphy has held numerous executive-level positions in healthcare, business development and finance, including executive vice president and chief financial officer of LifePoint Health, Inc. since September 2013 and as their chief development officer starting in 2011, president and chief executive officer of DSI Renal, Inc. from 2008 until 2011, and senior vice president and treasurer of CVS/Caremark, Inc. from 2006 to 2008.  Murphy also previously held leadership positions at Renal Care Group, Inc., National Nephrology Associates, Inc., and HealthSouth Corporation.

12.      Individual Defendant H. Lynn Massingale ("Massingale") has been a member of the Board since November 2005 and was named Executive Chairman in May 2008.  Prior to that, Massingale had been the Chief Executive Officer and director of the Company since 1994 and also held the title of President until October 2004.  Massingale previously served as President

and Chief Executive Officer of Southeastern Emergency Physicians, a provider of emergency physician services to hospitals in the Southeast and the predecessor of Team Health, Inc., which Massingale co-founded in 1979.

13.     Individual Defendant James L. Bierman ("Bierman") has been a member of the Board since August 2010.  From September 2014 to June 2015, Bierman served as President and Chief Executive Officer of Owens & Minor, Inc.  Previously, Bierman served in various other roles at Owens & Minor, Inc. including President and Chief Operating Officer from August 2013 to September 2014, Executive Vice President and Chief Operating Officer from March 2012 to August 2013, Executive Vice President and Chief Financial Officer from April 2011 to March 2012, and as Senior Vice President and Chief Financial Officer from June 2007 to April 2011. From 2001 to 2004, Bierman served as Executive Vice President and Chief Financial Officer at Owens & Minor, Quintiles Transnational Corp.  Bierman is a former director of Quintiles Transnational Corp. and of Pharma Services Holding, Inc., (the parent company of Quintiles Transnational Corp.). Prior to joining Quintiles Transnational Corp., Bierman was a partner at Arthur Andersen LLP from 1988 to 1998.

14.     Individual Defendant Edwin M. Crawford ("Crawford") has been a member of the Board since March 2016.  Crawford previously served as Chairman of CVS Caremark Corporation. Crawford joined Caremark (formerly known as MedPartners, Inc.) in 1998 and served as Chief Executive Officer, Director and Chairman from 1998 to 2007 and President from 1998 to 2000 and from 2004 to 2007. In 1999, as Chief Executive Officer of MedPartners, Crawford helped orchestrate the sale of Team Health, Inc. to a consortium of private equity firms.  Prior to joining Caremark, Crawford was Chairman and Chief Executive Officer of Magellan Health Services, Inc. (formerly known as Charter Medical Corporation), a leading

managed-care behavioral healthcare firm, which he joined in 1990. Crawford served as a Trustee of Colonial Properties Trust from 2011 until its merger with Mid America Apartment Communities Inc. in 2013. Crawford has also served as a Director of Genesis Health Ventures, Inc., Integrated Health Services, Inc., NeighborCare, Inc. and the U.S. Chamber of Commerce.

15. Individual Defendant Glenn A. Davenport ("Davenport") has been a member of the Board since December 2001. Since May 2013, Davenport has served as President of GA Foods. From March 2007 to February 2009, Davenport was President of Horizon Software International, LLC, a company specializing in food service technology. Davenport served as Chairman and Chief Executive Officer of Morrison Management Specialists, a food and nutrition services provider to the healthcare industry, until August 2006. Prior to that, he served in various management capacities with Morrison Restaurants, Inc. Davenport serves as a director of Cracker Barrel Old Country Stores, Inc.

16. Individual Defendant Patrick E. Fry ("Fry") has been a member of the Board since July 2015. Fry served as President and Chief Executive Officer of Sutter Health from 2005 to 2016. Prior to that, Fry served in numerous roles throughout Sutter Health including: Chief Operating Officer and Executive Vice President of Sutter Health, Executive Vice President of Sutter Health Western Division, President of Sutter Health East Division, and Regional President of Sutter Health Central in addition to several other roles. Fry currently serves on the board of Vizent Inc. and serves as an advisor to Evolent Health and Becker Hospital Review.

17. Individual Defendant Mary R. Grealy ("Grealy") has been a member of the Board since October 2012. Grealy has served as President of the Healthcare Leadership Council, a coalition of chief executives of the nation's leading healthcare companies and organizations, since 1999.

18.      Individual Defendant Vicky B. Gregg ("Gregg") has been a member of the Board since January 2013.  Gregg served as the Chief Executive Officer and as a Director of BlueCross BlueShield of Tennessee ("BCBST) from February 2003 until December 2012.  Prior to joining BCBST, Gregg served as a Market Vice President of Humana in Kentucky and Ohio.  Gregg served as a director of First Horizon National Corporation between January 2011 and April 2016 and has served as a director of Quest Diagnostics since July 2014.

19.      Individual Defendant Neil Kurtz ("Kurtz") has been a member of the Board since November 2013.  Kurtz is President and Chief Executive Officer of Golden Living, LLC, a privately-held skilled nursing, hospice, home healthcare and institutional pharmacy company.  Prior to joining Golden Living in 2008, Kurtz served as president and Chief Executive Officer of TorreyPines Therapeutics, Inc., and as president of Ingenix Pharmaceutical Services, Inc., a division of United Health Group ("UHG").  Kurtz co-founded Worldwide Clinical Trials, a contract research organization, where he held the positions of President and Chief Executive Officer until its acquisition by UHG in 1999.  His career also includes leadership positions with Boots Pharmaceuticals, Inc., Bayer Corporation, Bristol-Myers Company and Merck, Sharp and Dohme.  Kurtz currently serves on the corporate boards of Golden Gate National Senior Care Holdings and Medidata Solutions, Inc.  Kurtz previously served on the corporate boards for Ingenix, Inc.; NeurogesX, Inc.; Stemedica Cell Technologies and TorreyPines Therapeutics, Inc.

20.      Individual Defendant Scott Ostfeld ("Ostfeld") has been a member of the Board since March 2016.  Ostfeld is a partner of JANA Partners where he is co-portfolio manager of JANA's Strategic Investments Fund and is responsible for special situations investments, including active shareholder engagement.  Prior to joining JANA in 2006, Ostfeld was with GSC Partners in their distressed debt private equity group focused on acquiring companies through the

bankruptcy restructuring process and enhancing value as an active equity owner. Prior to GSC Partners, Ostfeld was an investment banker at Credit Suisse First Boston where he worked on a variety of M&A and capital raising assignments.

21.     Individual Defendant Kenneth H. Paulus ("Paulus") has been a member of the Board since July 2015. Paulus served as President and Chief Executive Officer of Allina Health from 2009 to 2014. Prior to joining Allina Health, Paulus was the President and Chief Executive Officer of Atrius Health System. Paulus serves on the board of Healthgrades and Cogentix Medical, Inc.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Team Health (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

23.     This action is properly maintainable as a class action because:

a.      The Class is so numerous that joinder of all members is impracticable. As of October 31, 2016, there were approximately 74.4 million shares of Team Health common stock outstanding, held by thousands of individuals and entities scattered throughout the country. The actual number of public shareholders of Team Health will be ascertained through discovery;

b.      There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)    whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9;

ii)   whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii)  whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

c.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I.    The Merger Consideration is the Result of a Flawed and Conflicted Sales Process and Fails to Adequately Compensate Team Health Shareholders**

24.    Team Health was founded in 1979 and is headquartered in Knoxville, Tennessee. The Company provides outsourced healthcare professional staffing and administrative services to hospitals and other healthcare providers in the United States.  It recruits and contracts with healthcare professionals who then provide professional services in third-party healthcare facilities.  The Company offers a range of services, including recruiting, scheduling, and credential coordination of clinical and non-clinical medical professionals; coding, billing, and collecting fees for services provided by medical professionals; administrative support services, such as payroll, professional liability insurance coverage, continuing medical education services, and management training; claims and risk management services; and standardized procedures and operational consulting, as well as provides experienced medical directors.  The Company offers outsourced physician staffing and administrative services in emergency medicine, hospital medicine, anesthesiology, inpatient services, scribes, ambulatory care, pediatrics, post-acute care, and other healthcare services.  The Company also offers healthcare management physician-related services; and non-physician staffing services, such as para-professional providers, nursing, specialty technicians, and administrative staffing to military and government facilities. In addition, it provides medical call center services, such as physician after-hours call coverage, community nurse lines, emergency department advice calls, physician referral, class scheduling, appointment scheduling, and web response.  The Company serves approximately 3,400 civilian and military hospitals, clinics, and physician groups in 47 states through healthcare

professionals, such as physicians, physician assistants, nurse practitioners, certified registered nurse anesthetists, and registered nurses.

25.     The Merger Consideration Team Health shareholders stand to receive if the Proposed Transaction is consummated fails to adequately compensate them for their shares.  The $43.50 offer price is below the recent price targets analysts have set for the Company, and is significantly below the $74.65 share price indicated by certain valuation analyses performed by Goldman Sachs.  The Merger Consideration also represents a ***27.1% discount*** compared to the Company's 52-week high trading price of $59.71.

26.     The inadequate Merger Consideration is the result of a flawed sales process plagued by conflicts of interest.

27.     The Board has agreed to sell the Company to Blackstone, which acquired Team Health from a consortium of investors in 2005 and exited its investment following an initial public offering of Team Health in 2009; representatives from Blackstone were therefore intricately familiar with Team Health and members of its senior management, and had an advantage over other interested suitors.

28.     Furthermore, the Board's legal counsel in connection with the Proposed Transaction, Simpson Thacher & Bartlett LLP ("Simpson Thacher"), represented Blackstone in connection with its ownership of Team Health from 2005 up to and following Team Health's IPO in 2009, and simultaneously represented Blackstone and its affiliates in matters while it was also acting as counsel to Team Health.  Proxy at 43.  This conflict required Blackstone and Team Health to executive consent and waiver forms allowing Simpson Thacher to continue to act as counsel to both entities.  *Id.*  Additionally, as it commenced diligence, Blackstone requested that Team Health provide a waiver to Simpson Thacher permitting its fund lawyers, who serve as

Blackstone's regular fund counsel, to provide fund level assistance and topside structuring support to Blackstone in connection with the Proposed Transaction. Proxy at 44. Team Health provided such waiver on September 27, 2016. *Id*. In other words, the law firm that was representing the Board and advising it with respect to its fiduciary obligations in connection with the Proposed Transaction was simultaneously working for Blackstone.

29.     Additionally, on October 7, 2016, Team Health agreed to permit Blackstone to contact J.P. Morgan Securities LLC ("J.P. Morgan") as a debt financing source to facilitate Blackstone's efforts to arrange its debt financing. J.P. Morgan acted as bookrunner and joint lead arranger, joint bookrunner and administrative agent with respect to Team Health's existing bonds and bank facility, respectively. Accordingly, Team Health and J.P. Morgan entered into a letter agreement explicitly granting Blackstone permission to engage with J.P. Morgan despite the fact that J.P. Morgan had access to Team Health's confidential information.

30.     Perhaps most troubling of all, Team Health's financial advisor, Goldman Sachs, has provided extensive financial services to Blackstone and its affiliates in recent years, for which it has received approximately $165 million. Proxy at 60. However, the Board was not made aware of certain "prior engagements or relationships between Goldman Sachs and Blackstone (and its affiliates)" until October 30, 2016, the same day the Board relied upon Goldman Sachs' fairness opinion and voted to approve the Proposed Transaction. Proxy at 48. By that point in time, it was too late for the Board to take appropriate action and engage a conflict-free financial advisor. Furthermore, according to *Bloomberg*, Goldman Sachs or its affiliates currently own 5,754,379 shares in Blackstone Group L.P., which controls Parent and Merger Sub. In other words, Goldman Sachs, the same bank that was hired to advise the Board with respect to the fairness of the Merger Consideration to Team Health's shareholders, currently

owns over $150.5 million in Blackstone stock. This significant conflict of interest is not disclosed in the Proxy, and is clearly material information to Team Health shareholders.

31.     Team Health management and the Board proceeded to conduct a strategic review process with these various entities involved, despite the significant conflicts of interest.

32.     In 2015, the Board and Team Health management turned down a $5 billion offer to acquire the Company from rival Amsurg Corp.

33.     On November 23, 2015, Team Health completed its acquisition of IPC Healthcare, Inc. in a transaction valued at approximately $1.6 billion, Team Health's largest acquisition ever. The IPC deal was funded on the dime of Team Health shareholders and was touted to shareholders as a deal that would enable the Company to "be better positioned to capitalize on key trends . . . create an industry leader in the hospital based and post-acute settings with an expanded network of services and solutions that would drive long-term shareholder value . . . and would be accretive to Team Health's earnings, would result in an enhanced financial profile, and allow for strong cash flows and deleveraging, along with ongoing financial flexibility to fund future growth." Nevertheless, less than a year later, Team Health management and the Board have agreed to sell the Company in an all-cash transaction that fails to adequately compensate shareholders for their shares and deprives them of the ability to participate in the Company's future gains.

34.     In February 2016, activist hedge fund JANA Partners LLC ("JANA") acquired over 7% of Team Health's outstanding shares and advised the Board that it intended to nominate three individuals for election to the Board at the 2016 annual stockholder meeting. JANA also publicly criticized the Board and Team Health management for their "missteps in critical areas including capital allocation, strategy and governance." The Board and Company management

were undoubtedly aware of JANA's reputation of agitating for governance and leadership changes and aggressively pushing strategic transactions. The Board and management immediately pandered to JANA, and throughout February and March, representatives of Team Health engaged in discussions with representatives of JANA, which discussions included, among other things, JANA's perspective on Team Health's strategic plan, financial performance and Board composition.

35.     On March 22, 2016, Team Health entered into a cooperation agreement with JANA, which, among other things, provided that in return for JANA agreeing to a standstill, which included an agreement not to commence a proxy contest in support of an alternative slate of directors at Team Health's 2016 annual meeting of stockholders, Team Health agreed to add Individual Defendant Scott Ostfeld, Partner of JANA and Co-Portfolio Manager of JANA Strategic Investments, and Edwin (Mac) Crawford, former Chairman of CVS Caremark Corporation, to the Team Health Board effective concurrently with the execution of the cooperation agreement. Additionally, Team Health agreed to appoint Nancy M. Schlichting, Chief Executive Officer of Henry Ford Health System, to the Team Health Board in January 2017. Pursuant to the cooperation agreement, Ostfeld and Crawford were also added to the Transaction Committee, which was designated with authority to pursue strategic transactions, and, as of the Team Health annual meeting of stockholders held on May 25, 2016, one of the Company's former directors, Joseph L. Herring, ceased serving on the Transaction Committee and the Team Health Board.

36.     With JANA's hand-picked directors in place, the Board proceeded to conduct a fundamentally flawed sales process mired with conflicts of interest.

37. On June 3, 2016, an unknown private equity firm referred to as "Party B" submitted a preliminary proposal letter reflecting an acquisition of Team Health at a valuation range of $52-$56 per share in cash. The Board was unable to finalize a deal with Party B over the course of the next two months, and on August 9, 2016, Party B submitted a revised proposal letter reflecting an acquisition of Team Health for $46 per share in cash and outlining in more detail Party B's financing plans.

38. On August 24, 2016, an affiliate of Blackstone, on behalf of Blackstone Core Equity Partners L.P., submitted a preliminary proposal letter reflecting an acquisition of Team Health at a valuation range of $48-$50 per share in cash. The proposal letter outlined Blackstone's valuation assumptions, financing plans and additional due diligence requirements, noting its familiarity with the business given its prior ownership of Team Health.

39. On September 6, 2016, Team Health suddenly announced the appointment of Individual Defendant Leif Murphy as its new President and Chief Executive Officer to succeed Michael D. Snow and to replace him as a member of the Team Health Board. The press release announcing Murphy's arrival failed to provide any information concerning when Snow decided to retire and why he decided to do so in the midst of the sales process, one month before the Merger Agreement was entered into. Murphy's retention was influenced by Messrs. Ostfeld and Crawford, the JANA affiliated directors. Murphy and Crawford presumably already knew each other, as they both were previously affiliated with CVS Caremark Inc. the Proxy fails to provide any information concerning how the Board came to select Murphy as CEO, and why it chose a replacement for Snow from outside the Company a mere month prior to agreeing to the Proposed Transaction.

40.     Murphy was personally interested in finalizing a deal with Blackstone.  He stands to receive over $26 million in golden parachute compensation for a few months of work if the Proposed Transaction is consummated.  Proxy at 72.

41.     On September 19, 2016, Blackstone submitted a proposal to acquire Team Health for $50.00 per share in cash.  A mere thirty days later, Blackstone purportedly cited "headwinds facing the business and the healthcare services sector more generally" as a rationale for reducing its offer price.  The Proxy fails to describe what these "headwinds" were with any detail, nor does it explain how the business prospects of the health services sector in general could have changed so significantly in the course of a month to justify a reduction in price from $50.00 to $43.00 per share.

42.     On October 22, 2016, Blackstone cited Team Health's reduced forecast for the second half of 2016 and "*certain items Blackstone identified in its continuing due diligence*" as the basis for reducing its offer from $50.00 to $43.00 per share.  The revised forecast did not justify a significant reduction in offer price, as the Proxy makes clear that such projections "were generally consistent with the projections previously reviewed by the Team Health Board and shared with Blackstone other than the updates to reflect the most recent operating results." Proxy at 46.  And the Proxy fails to provide any information concerning the "certain items" Blackstone identified that supposedly justified its lower offer.  Team Health shareholders would undoubtedly find such information material, and they have a right to understand the rationale behind why their shares were suddenly worth $7.00 less to Blackstone.

43.     On October 27, 2016, the Board purportedly determined that it was unlikely to pursue a transaction with Blackstone at $43.00 per share.  The very next day, the Board determined that a mere 50 cents (1%) increase in Blackstone's offer price was "the best value

reasonably attainable under the circumstances for the Team Health stockholders." Proxy at 47. The Board apparently reached this conclusion despite the fact that it had not reached out to a *single* party that had expressed interest in pursuing a transaction after news that Team Health was exploring a sale of the Company was reported by the press on October 4, 2016. The Proxy notes that while the Board and Goldman Sachs had received multiple inquiries regarding a strategic transaction from both private equity and strategic parties between October 4th and the signing of the Merger Agreement on October 30th, they did not respond to a single inquiry despite the fact that the exclusivity agreement with Blackstone expired on October 21st.

44. On October 30, 2016, Team Health's general counsel provided the Board with "an updated disclosure statement provided by Goldman Sachs, which identified prior engagements or relationships between Goldman Sachs and Blackstone (and its affiliates)." Proxy at 47-48. The Proxy fails to specify when Goldman Sachs provided its original disclosure statement, and precisely what was "updated" from the original disclosure statement compared to the statement provided to the Board on October 30th, the very same day it relied upon Goldman Sachs' fairness opinion and approved the Proposed Transaction. The Proxy also fails to provide any information regarding the "prior engagements or relationships between Goldman Sachs and Blackstone" that were specifically referenced in the *updated* disclosure statement, and why they were not provided in Goldman Sachs' original disclosure statement. Such information is material to Team Health's shareholders; indeed, it is well settled that information that bears on whether an investment bank faces conflicts of interest is material to stockholders when deciding how to vote on a merger.

45. In sum, the Merger Consideration fails to adequately compensate Team Health shareholders, and is the resulted of a flawed sales process during which Company management

and the Board: retained and were advised by a conflicted financial advisor and law firm; failed to conduct a sufficient and robust review of strategic alternatives; failed to adequately pursue proposals from other interested parties that could have provided significant value to the Company's shareholders; and fixated on finalizing a deal with a familiar suitor, Blackstone.

## II.    The Merger Agreement's Deal Protection Provisions Deter Superior Offers

46.    In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for Team Health.

47.    First, after the expiration of a limited "go-shop" period on December 10, 2016, the Merger Agreement contains a no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for Team Health shareholders.  Specifically, the Merger Agreement states that the Company and the Individual Defendants shall not: (i) initiate, solicit, propose or knowingly encourage or knowingly facilitate any inquiry or the making of any proposal or offer that constitutes, or would reasonably be expected to lead to, an acquisition proposal; (ii) engage in, continue or otherwise participate in any discussions or negotiations relating to any acquisition proposal; or (iii) provide any non-public information to any person in connection with any acquisition proposal.

48.    Additionally, the Merger Agreement grants Blackrock recurring and unlimited matching rights, which provides it with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) several business days to negotiate with Team Health, amend the terms of the Merger Agreement and make a counter-offer in the event a superior offer is received.

49.    The non-solicitation and matching rights provisions essentially ensure that a

superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that Team Health can easily foreclose a competing bid. As a result, these provisions unreasonably favor Blackrock, to the detriment of Team Health's public shareholders.

50.    Lastly, the Merger Agreement provides that Team Health must pay Blackrock a termination fee of $50.4 million in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal during the "go-shop" period, and $100.8 million with respect to terminations made for superior proposals made after the no-shop period start date. The termination fee provisions further ensure that no competing offer will emerge, as any competing bidder would have to pay a naked premium for the right to provide Team Health shareholders with a superior offer.

51.    Ultimately, these preclusive deal protection provisions restrain Team Health's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

52.    Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that Team Health's shareholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Transaction.

## III.    The Materially Incomplete and Misleading Proxy

53.    On November 23, 2016, Team Health filed the Proxy with the SEC in connection with the Proposed Transaction. The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction. The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to

ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

54. With respect to the *Background of the Merger* section, the Proxy references that "certain co-investors" of Blackstone are involved in the Proposed Transaction, but fails to disclose the identity of these "co-investors." Such information is material to Team Health shareholders and necessary for them to assess additional conflicts of interest that may exist based on the identity of the co-investors and their relationships with the Board, management and/or Goldman Sachs. The omission of this information renders the vague references to Blackstone's "co-investors" materially incomplete and misleading.

55. Additionally, the Proxy references that a healthcare company identified as "Party C" "had previously expressed an interest in an acquisition [of] a division of TeamHealth." Proxy at 41. However, the Proxy fails to provide any information concerning when Party C made such an expression of interest, the details of its expression of interest including which division of the Company it was interested in acquiring, and how the Company responded. The omission of such information renders the vague reference to Party C's expression of interest materially incomplete and misleading.

56. With respect to the "unsolicited inquiries" the Board and Goldman Sachs received from private equity and strategic parties since October 4th, the Proxy fails to specify the number of "inquiries" received and whether any inquiries proposed a potential transaction structure or terms. The omission of such information renders the vague reference to these "unsolicited inquiries" on page 46 of the Proxy materially incomplete and therefore misleading.

57.     With respect to the conflicts of interest that permeated the sales process, the Proxy fails to disclose the business relationship between JANA and Blackstone and JANA and Goldman Sachs, including whether JANA currently or in the past has had any business ties with either entity or their affiliates.  As noted above, JANA is a notorious activist investor that acquired its stake in the Company when the Company's stock price was trading below its intrinsic value with an eye towards reaping a quick premium on its investment by facilitating a quick sale of the Company.  JANA's interests are therefore not aligned with the rest of Team Health's public shareholders.  Indeed, JANA has entered into a voting agreement and pledged to vote its shares in favor of the Proposed Transaction, despite the fact that Goldman Sachs' valuation analyses indicates the Company is worth as much as $74.65 per share.  It is therefore imperative that shareholders understand the nature and extent of the relationship that exists between JANA and Blackstone and/or Goldman Sachs.  The omission of such information renders the references to JANA in the Proxy statement and its interests in the Proposed Transaction materially incomplete and therefore misleading.

58.     The Proxy also references that the Company incurred "fees related to the acquisition of shares of TeamHealth common stock by JANA in February 2016," Proxy at 56, but fails to specify the amount of such fees and whether the Company paid JANA in connection with their cooperation agreement.  The omission of such information renders the references to such "fees" and the circumstances surrounding JANA's cooperation agreement materially incomplete and therefore misleading.

59.     The Proxy also fails to inform shareholders that Goldman Sachs or its affiliates currently own 5,754,379 shares in Blackstone Group L.P., which controls Parent and Merger Sub.  In other words, Goldman Sachs, the same bank that was hired to advise the Board with

respect to the fairness of the Merger Consideration to Team Health's shareholders, currently owns over $150.5 million in Blackstone stock. This significant conflict of interest is clearly material information to Team Health shareholders. The omission of this information renders the vague and boilerplate statement in the Proxy that Goldman Sachs "may at any time" hold investments in Blackstone and its affiliates (Proxy at 59) materially incomplete and misleading, because it states that Goldman Sachs "may" hold such investments when Goldman Sachs does in fact actually hold a significant position in Blackstone.

60.     The Proxy also fails to provide Team Health shareholders with sufficient information to assess and understand the valuation analyses performed by Goldman Sachs. Defendants have told Team Health shareholders that such analyses support the financial fairness of the Merger Consideration, and it is therefore imperative that shareholders receive all material information necessary for them to assess these analyses.

61.     With respect to Goldman Sachs' *Implied Premia and Multiple Analysis* (Proxy at 55-56) the Proxy fails to disclose the multiples or share price ranges that were utilized for purposes of comparing the implied transaction enterprise value multiples set forth on page 56 of the Proxy. The omission of such information renders the summary of this analysis materially incomplete and therefore misleading.

62.     With respect to Goldman Sachs' *Premiums Paid Analysis* (Proxy at 56-57), the Proxy fails to disclose the specific transactions utilized for the analysis and the range and mean premiums paid for 2011-2016. Instead, the Proxy only provides the median premiums paid for each year, and states that this analysis "resulted in a range of implied values from $39.35 to $47.55 per share of Team Health common stock." The omission of the premiums for each transaction reviewed or the high/low range and mean premiums for each year renders the implied

value range set forth in the Proxy misleading, as shareholders are unable to assess whether the range of illustrative premiums Goldman Sachs applied was appropriate and whether the implied value range accurately reflects the value of their shares.

63.     A fair summary of a *Premiums Paid Analysis* requires the disclosure of either the individual multiples for each transaction utilized, or, at the very least, the high/low range, mean and median multiples.  Merely providing one of these metrics and the range that a banker applied is insufficient, as shareholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied share price ranges.

64.     With respect to Goldman Sachs' *Selected Publicly Traded Companies Analysis* (Proxy at 58) the Proxy fails to disclose the resulting range of implied values per share of Team Health common stock that were derived from the analysis.  Goldman Sachs calculated such a range in connection with its *Selected Precedent Transactions Analysis*, and presumably did so for its *Selected Publicly Traded Companies Analysis* as well.  The omission of the implied share price range arrived at in connection with this analysis renders the summary contained on page 58 of the Proxy materially incomplete and therefore misleading.  By providing solely the Enterprise Value/NTM EBITDA Multiples without a price range, shareholders are unable to assess the fairness of the Merger Consideration under this analysis.

65.     The Proxy also discloses certain non-GAAP (generally accepted accounting principles) financial projections for the Company that were prepared by management and relied upon by Goldman Sachs for its fairness opinion.  However, the Proxy fails to disclose the line item projections for the metrics that were used to calculate the non-GAAP projections included

in the Proxy and/or the most directly comparable GAAP measures, including projections for the metrics used to calculate "Adjusted EBITDA" and "Unlevered Free Cash Flow." Proxy at 61.

66. Specifically, the Proxy notes that "'Adjusted EBITDA' is defined as net earnings before interest expense (net), provision for income taxes, depreciation and amortization, as adjusted to exclude gains or losses associated with TeamHealth's non-qualified retirement plan, transaction-related costs, expenses and fees, costs related to equity-based compensation, and write-offs of deferred financing costs and certain financing fees and expenses." Proxy at 61. However, none of the projections for these various line items are disclosed.

67. The Proxy further notes that "Unlevered Free Cash Flow" is defined as net earnings before interest expense (net), provision for income taxes, depreciation and amortization; less depreciation and amortization, contingent purchase expense and other expense (income); less taxes; plus depreciation and amortization; less maintenance capital expenditures and acquisition spend; plus (less) changes in operating assets/liabilities and impact of contingent payment/liability; less certain one-time expenses; and plus other investing cash flow. Proxy at 61. However, none of the projections for these various line items are disclosed.

68. When a company discloses information in a Proxy that includes non-GAAP financial measures, the Company must also disclose comparable GAAP measures and a quantitative reconciliation of forward-looking information. 17 C.F.R. § 244.100.

69. Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders. The SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Team Health has included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.

70.    In recent months, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heighted its scrutiny of the use of such projections. Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[1] One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide *any* reconciling metrics that are available without unreasonable efforts. The above-referenced line item projections that have been omitted from the Proxy are precisely the types of "reconciling metrics" that the SEC has recently indicated should be disclosed to render non-GAAP financial projections not misleading to shareholders.

---

[1] *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm

1.      Here, the Proxy specifically notes that "[c]*ertain of the measures included in the Financial Projections may be considered non-GAAP financial measures. Non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP, and non-GAAP financial measures as used by TeamHealth may not be comparable to similarly titled amounts used by other companies.*"   Proxy at 63. Nevertheless, by including only the non-GAAP projections in the Proxy, Defendants are asking Team Health shareholders to rely upon and consider such projections "in isolation from, and as a substitute for, financial information presented in compliance with GAAP."   In other words, the Proxy tells shareholders trying to assess the fairness of the Proposed Transaction and make sense of the Company's financial projections that the disclosed projections are actually of little use to them, and further fails to provide them with the projections that would allow them to make sense of the misleading non-GAAP projections that are included in the Proxy.   The line item projections for the various adjustments that were made to the Company's non-GAAP financial projections must be disclosed to shareholders in order to make the currently disclosed projections not misleading.

71.      Lastly, while the Proxy discloses the revenue and Adjusted EBITDA numbers management derived for its "July Projections," Proxy at 61, it fails to disclose the unlevered free cash flow projections, and also fails to provide the line item projections for the metrics used to calculate these non-GAAP measures.   Future cash flow projections for a corporation that is proposed to be sold in a cash merger is clearly material information.   When shareholders must vote on a transaction in which they would receive cash for their shares, information regarding the financial attractiveness of the deal is of particular importance.   This is because the shareholders must measure the relative attractiveness of retaining their shares versus receiving a cash

payment, a calculus heavily dependent on the shareholders' assessment of the company's future cash flows. Under sound corporate finance theory, the value of stock should be premised on the expected future cash flows of the corporation; accordingly, the question that Team Health shareholders need to assess in determining whether to vote for the Proposed Transaction is clear: is the price being offered now fair compensation for the benefits they will receive as a shareholder from the future expected cash flows of the corporation if the corporation remains as a going concern? The omission of such information renders the summary of the July Projections in the Proxy materially incomplete and misleading.

72.     In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against Team Health and the Individual Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)**

73.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

74.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

75.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction.   Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) the Company's strategic review process and conflicts of interests that tainted the process; (ii) the Company's financial projections; and (iii) the valuation analyses performed by Goldman Sachs in support of its fairness opinion.

76.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.   Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).   The Individual Defendants were therefore reckless, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

77.     The Individual Defendants knew or were reckless in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.   The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Goldman Sachs reviewed and discussed its financial analyses with the Board, and further states that the Board considered both the financial analyses provided by Goldman Sachs as well as its fairness opinion and the assumptions made and matters considered in connection therewith.   Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and proposals received from interested parties and communications with such parties.   The Individual Defendants knew or were reckless

in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review the banker's analyses in connection with their receipt of the fairness opinions, question the banker as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

78.     Individual Defendant Leif Murphy, the Company's Chief Executive Officer, was, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  Murphy was negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which he was required to do carefully as the Company's CEO.  Indeed, Murphy was intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections, and was "thoroughly briefed by other members of management, other directors and TeamHealth's financial and legal advisors on a range of issues, including the status of discussions with Party B and Blackstone."  Proxy at 43. Team Health is also deemed negligent as a result of Murphy's negligence in preparing and reviewing the Proxy.

79.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to

inflict.

**COUNT II**

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

80.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

81.     The Individual Defendants acted as controlling persons of Team Health within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Team Health, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

82.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

83.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

84.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

85.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

86.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

87.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

Case 3:16-cv-00675-PLR-HBG   Document 1   Filed 12/02/16   Page 31 of 32   PageID #: 31

C.      Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 2, 2016

Respectfully submitted,

/s/ J. Gerard Stranch, IV
J. Gerard Stranch, IV, BPR# 23045
**BRANSTETTER, STRANCH**
**    & JENNINGS, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Phone: (615) 254-8801
Fax: (615) 255-5419
gerards@bsjfirm.com


**OF COUNSEL:**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, 59th Floor
New York, NY 10118
Tel: (212) 971-1341
E-mail: jmonteverde@monteverdelaw.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*